**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1034**

RICHARD EDWARDS, JR.,

                Plaintiff − Appellee,

        v.

CARDINAL TRANSPORT, INC.,

                Defendant – Appellant,

        and

MCELLIOTTS TRUCKING, LLC; DANNY MCGOWAN, individually and as an employee of McElliotts Trucking, LLC and/or as agent of Cardinal Transport; HAROLD MIDKIFF, individually as agent driver of McElliotts Trucking, LLC and/or as agent driver of Cardinal Transport, Inc.,

                Defendants.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Robert C. Chambers, District Judge. (3:16-cv-01879)

Argued: January 29, 2020                                    Decided: June 26, 2020

Before AGEE, DIAZ, and HARRIS, Circuit Judges.

Affirmed by unpublished opinion. Judge Diaz wrote the majority opinion, in which Judge Harris joined. Judge Agee wrote a dissenting opinion.

**ARGUED:** Matthew Allen Fitzgerald, MCGUIREWOODS LLP, Richmond, Virginia, for Appellant.  Anthony J. Majestro, POWELL & MAJESTRO, PLLC, Charleston, West Virginia, for Appellee.  **ON BRIEF:**  Sarah Ray Bennett, MCGUIREWOODS LLP, Richmond, Virginia, for Appellant.  Richard W. Weston, Connor D. Robertson, WESTON ROBERTSON, Huntington, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Richard Edwards, Jr. was helping Danny McGowan load metal rods onto McGowan's truck when one of those rods fell from the forklift McGowan was operating and crushed Edwards's foot. Edwards brought suit, alleging that McGowan was an employee of Cardinal Transport, Inc., and that Cardinal was vicariously liable for McGowan's negligence. Prior to trial, the district court held that certain federal regulatory provisions created a rebuttable presumption that McGowan was Cardinal's employee and, thereafter, instructed the jury to that effect.

On appeal, Cardinal argues that the district court erred in its interpretation of the regulations and in its subsequent denial of Cardinal's request for a new trial. Because we find that any error in the jury instructions was harmless and that the jury verdict was supported by the record, we affirm.

I.

A.

We first address the regulatory framework at the heart of this appeal. In 1956, Congress amended the Interstate Commerce Act to allow the Interstate Commerce Commission[1] to regulate motor carriers' leasing arrangements. *See* Act of Aug. 3, Pub. L.

---

[1] The relevant regulatory authority has since passed to the Secretary of Transportation. *See* 49 U.S.C. § 14102.

No. 84–957, 70 Stat. 983 (1956). This amendment followed a trend in the trucking industry, in which motor carriers, which sell transportation services, increasingly leased equipment from owner-operators in a manner that evaded responsibility for regulatory compliance. *See Am. Trucking Ass'ns v. United States*, 344 U.S. 298, 303, 310 (1953). The amendment provided:

> The Secretary may require a motor carrier . . . that uses motor vehicles not owned by it to transport property under an arrangement with another party to . . . have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier.

49 U.S.C. § 14102(a).

Pursuant to that authority, the Commission promulgated the Federal Motor Carrier Safety Regulations (the "safety regulations") to "correct widespread abuses" of truck leasing, and to hold motor carriers "responsible in fact, as well as in law, for the maintenance of leased equipment and the supervision of borrowed drivers." *Proctor v. Colonial Refrigerated Transp., Inc.*, 494 F.2d 89, 92 (4th Cir. 1974) (cleaned up). As relevant here, one provision of the safety regulations requires that lease agreements confer to lessee motor carriers the "exclusive possession, control, and use of the equipment," as well as "complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1) (the "control regulation").

In the years that followed, many courts interpreted the control regulation as imposing strict liability, or an "irrebuttable presumption" of employment status, on lessee motor carriers. *See Delaney v. Rapid Response, Inc.*, 81 F. Supp. 3d 769, 775 (D.S.D.

4

2015) (noting that "the majority view among courts interpreting [the control regulation] was to impose strict liability on lessee-carriers for the negligence of owner-operators"); *Carolina Cas. Ins. Co. v. Ins. Co. of N. Am.*, 595 F.2d 128, 137 n.29 (3d Cir. 1979) (concluding that "federal law in effect creates an irrebuttable presumption of an employment relationship between a driver and the lessee whose placards identify the vehicle").  The imposition of liability in this manner became known as "logo liability."

In 1992, the Commission amended its regulations to "give notice to the courts" that its regulations were not intended to "define or affect the relationship between a motor carrier lessee and an independent owner-operator lessor."  Petition to Amend Lease and Interchange of Vehicle Regulations, 57 Fed. Reg. 32905-01 (July 24, 1992) (codified at 49 C.F.R. 376.12(c)).  This notice was needed, the Commission explained, because "some courts and State workers' compensation and employment agencies have relied on our current control regulation and have held the language to be prima facie evidence of an employer-employee relationship."  Petition to Amend Lease and Interchange of Vehicle Regulations, 8 I.C.C.2d 669, 671 (1992).  Accordingly, the Commission adopted the following amendment:

> Nothing in the provisions required by [the control regulation] is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee.  An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements.

§ 376.12(c)(4) (the "1992 amendment").  The Commission did not, however, repeal the control regulation.

5

B.

With this regulatory context in mind, we turn to this appeal, which arises from an accident that occurred when Edwards was helping McGowan load heavy metal rods onto McGowan's truck. As McGowan operated a forklift to load the rods, one of the rods fell and crushed Edwards's foot. Edwards suffered severe pain and extensive injuries from the incident, including the amputation of his leg.

At the time of the accident, McGowan was working for Cardinal, a motor carrier, in two capacities. First, as an exclusive sales agent, McGowan solicited customers and negotiated shipment sales for Cardinal. This relationship was governed by the "Exclusive Freight Sales Agency Agreement," which incorporated by reference a "Policy Manual" prepared by Cardinal. Second, as an owner-operator, McGowan leased trucks and delivered shipments for Cardinal through his company, McElliotts Trucking, LLC.[2] This relationship was governed by an "Independent Contractor Agreement," which included a term that conferred to Cardinal "exclusive possession, control and use" of leased equipment, as well as "complete responsibility" for its operation. J.A. 110. That term, the lease noted, was included "solely to conform" with federal regulations and not to affect employment status. *Id.* (citing 49 C.F.R. § 376.12(c)).

Over the course of his work for Cardinal, McGowan occasionally received shipment orders that didn't fill an entire truck. When this occurred, McGowan would sometimes

---

[2] The district court referred to McGowan and McElliotts interchangeably as "McGowan/McElliotts" for purposes of the vicarious liability analysis. We refer to both entities as McGowan.

6

store the freight at his truck yard until he could consolidate it with other orders to fill the truck. McGowan regularly engaged in this consolidation practice for over ten years. Consolidation allowed Cardinal's clients to satisfy internal deadlines for the freight to be removed from their property, while also allowing Cardinal's drivers to earn more money per truck. McGowan was consolidating an order for one of Cardinal's clients, Special Metals, when Edwards was injured.

## C.

In his complaint, Edwards alleged that Cardinal was liable for McGowan's negligence under a common law theory of vicarious liability, as well as under a theory of logo liability. Cardinal moved for summary judgment, raising two arguments relevant to this appeal. First, Cardinal argued that it wasn't vicariously liable for McGowan's negligence because it lacked "power of control" over his work and because the act of consolidating shipments was beyond the scope of his employment. *See Cunningham v. Herbert J. Thomas Mem'l Hosp. Ass'n*, 737 S.E.2d 270, 277 (W. Va. 2012).[3] Second, Cardinal argued that it wasn't liable under a theory of "logo liability" because West Virginia courts don't impose strict liability on lessee motor carriers for the negligence of lessor owner-operators.

---

[3] A federal court sitting in diversity applies the law of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In West Virginia, tort liability is determined by the law of the place in which the wrong occurred. *Paul v. Nat'l Life*, 352 S.E.2d 550, 556 (W. Va. 1986). Because the accident occurred at a truck yard in West Virginia, the vicarious liability analysis is governed by West Virginia law.

7

The district court denied Cardinal's motion, finding that the evidence underlying Edwards's common law vicarious liability claim was sufficient to survive summary judgment. Additionally, the court found that Edwards's logo liability claim wasn't an independent claim, but instead "assume[d] an additive role" to Edwards's common law claim. J.A. 65.

The court then pivoted to analyze the relevant regulatory framework, including the control regulation and 1992 amendment. Noting the lack of consensus among federal courts, the court determined that the most reasonable interpretation of the two regulations was that, together, they created a "rebuttable presumption" of employment status that "can be rebutted by resort to state common law principles." J.A. 68.

Cardinal subsequently moved prior to trial to exclude all reference to the regulations. The regulations were irrelevant to the contested "control" element of vicarious liability, Cardinal argued, because they were indicative *only* of the government's control over Cardinal, and *not* of Cardinal's control over McGowan. The district court denied the motion, referring back to its prior decision that the regulations were additive to Edwards's common law claim and created a rebuttable presumption of employment.

D.

The case proceeded to trial. At the close of the evidence, the court instructed the jury that to find Cardinal vicariously liable for McGowan's negligence, it must find, among other things, that (1) there was an employer-employee relationship between McGowan and Cardinal, and (2) McGowan was acting within the scope of that relationship during the accident.

8

The court instructed that "[t]he burden is on Mr. Edwards to establish that there was an employer/employee relationship" between McGowan and Cardinal. J.A. 93. This burden, the court instructed, could be carried "in one of two ways." *Id.* First, over Cardinal's objection, the court read the control regulation to the jury, which requires that leases include a term conferring "complete responsibility for the operation of the equipment" to the motor carrier. *Id.* Thus, the court instructed that if the jury found that equipment leased to Cardinal was being operated at the time of the accident, then there is "a rebuttable presumption" of employment status, "and the burden shifts to Cardinal . . . to disprove that relationship." *Id.* Alternatively, the court instructed that Edwards could prove each common law element of vicarious liability by a preponderance of the evidence. The court then listed the four common law elements, only one of which—the power of control—was contested by Cardinal.

Next, the court instructed the jury on Cardinal's independent contractor defense, stating, "One who hires an independent contractor is not liable for physical harm caused by an act or omission of the independent contractor." J.A. 95. "The burden is on Cardinal," the court instructed, "to prove by a greater weight of the evidence" that it "did not direct, supervise, or control [McGowan]." J.A. 95–96. The court further explained that if Cardinal were to carry that burden, then it couldn't be held liable for McGowan's acts.

The jury returned a verdict for Edwards and awarded him over $5 million in damages. Cardinal moved for a new trial, arguing that the verdict went against the clear weight of the evidence that McGowan was acting outside the scope of his employment at the time of the accident. The district court denied the motion, and this appeal followed.

9

II.

Cardinal argues that the district court erred by (1) concluding that the regulations create a rebuttable presumption of employment status, and (2) denying its request for a new trial. We address each argument in turn.

A.

1.

We begin with Cardinal's claim that the district court erred when it concluded that, together, the control regulation and the 1992 amendment create a rebuttable presumption of employment status. The district court's interpretation of federal regulations is a legal issue that we review de novo. *Stone v. Instrumentation Lab. Co.*, 591 F.3d 239, 242–43 (4th Cir. 2009).

As the district court noted, federal courts have taken three paths when interpreting the post-1992 regulations. A group of courts continues to rely on the control regulation, without reference to the 1992 amendment, for the proposition that an owner-operator is the "statutory employee" of the carrier-lessee for the duration of the lease agreement. *See, e.g.*, *Jackson v. O'Shields*, 101 F.3d 1083, 1086 (5th Cir. 1996); *Zamalloa v. Hart*, 31 F.3d 911, 914 (9th Cir. 1994). Another group interprets the 1992 amendment as removing the control regulation from the employment status analysis altogether, thereby placing the matter entirely in the realm of state law. *See, e.g.*, *Jett v. Van Eerden Trucking Co.*, No. CIV-10-1073-HE, 2012 WL 37504, at *4 (W.D. Okla. Jan. 9, 2012); *Penn v. Va. Int'l Terminals, Inc.*, 819 F. Supp. 514, 523 (E.D. Va. 1993). And a third group interprets the two regulations as creating a "rebuttable presumption" of employment status. *See, e.g.*, *Thomas*

10

*v. Johnson Agri-Trucking*, 802 F. Supp. 2d 1242, 1249 (D. Kan. 2011); *Bays v. Summitt Trucking, LLC*, 691 F. Supp. 2d 725, 729 (W.D. Ky. 2010).The district court adopted the rebuttable presumption approach, finding that it was the only way to avoid the "fundamental problem" of ignoring either the control regulation or the 1992 amendment. J.A. 69.[4] This approach incorporates the control regulation, the court reasoned, by acknowledging that the regulations support a *prima facie* case that the motor carrier employs (and thus exercises control over) the owner-operator. The rebuttable presumption approach also incorporates the 1992 amendment by allowing the motor carrier to rebut that *prima facie* case, thereby leaving the ultimate determination a matter of state common law. Additionally, the court noted that the rebuttable presumption approach mirrors vicarious liability under state common law, where a *prima facie* case of employment shifts the burden

---

[4] The dissent says that this approach conflicts with those of our sister circuits. *See Great West Cas. Co. v. Nat'l Cas. Co.*, 807 F.3d 952 (8th Cir. 2015); *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853 (8th Cir. 2010); *Simpson v. Empire Truck Lines, Inc.*, 571 F.3d 475 (5th Cir. 2009). But we don't interpret these cases so broadly.

*Great West* was an insurance action wherein the respective insurers of an owner-operator and a motor carrier disputed which party was contractually obligated to defend a state court negligence action against the owner-operator. *See Great West*, 807 F.3d at 955–56. In that context, the court rejected the argument that the safety regulations' "definition of employee . . . should replace any contrary definitions in [the] policy or in state law." *Id.* at 958. *Huggins* and *Simpson* principally confronted claims that the safety regulations *alone* confer employment status, and thus, discuss a theory of liability that was expressly disclaimed by the district court here. *See Huggins,* 592 F.3d at 861–63; *Simpson,* 571 F.3d at 476–77. Neither case considers (let alone decides) whether the regulations can be considered as *prima facie* evidence of employment.

11

of proof to the party invoking the independent contractor defense. *See Zirkle v. Winkler*, 585 S.E.2d 19, 24 (W. Va. 2003) ("[O]nce a master/servant *prima facie* case has been shown, the burden of establishing the independent contractor exception to *respondeat superior* lies on the party asserting the exception as a defense to liability.").

Cardinal contends that the only possible reading of the 1992 amendment is to render the control regulation categorically inapplicable to the vicarious liability analysis. After all, says Cardinal, the amendment explicitly provides that "[n]othing" in the control regulation "is intended to affect whether the lessor . . . is an independent contractor or an employee of the authorized carrier lessee." § 376.12(c)(4). Moreover, Cardinal points out that the Commission explicitly noted that the 1992 amendment was precipitated by the view of certain courts that the language of the control regulation was "prima facie evidence of an employer-employee relationship." Petition to Amend Lease and Interchange of Vehicle Regulations, 8 I.C.C.2d at 671. Alternatively, Cardinal argues that the district court's jury instruction was error because the control regulation applies only to leased trucks that are "in operation," and not to leased trucks that are being loaded or unloaded. Edwards responds that the court's rebuttable presumption instruction was correct and that, in any event, the alleged error was harmless.

As we explain, because we find that any error was harmless, we need not decide whether the court erred in giving the jury instruction.

### 2.

When determining whether the district court erred in its jury instructions, we review the instructions "as a whole." *Huskey v. Ethicon, Inc.*, 848 F.3d 151, 159 (4th Cir. 2017).

An erroneous jury instruction warrants a new trial only if the "instruction *seriously* prejudiced the challenging party's case." *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 233 (4th Cir. 2016) (cleaned up).

Here, the district court instructed the jury that the burden was on Edwards to establish that McGowan was Cardinal's employee. The jury was further instructed that Edwards could carry this burden by establishing that the equipment was leased by Cardinal at the time of the accident (thus triggering a rebuttable presumption of an employer/employee relationship between Cardinal and McGowan), or by relying on state common law elements of vicarious liability. Relevant here, those elements include the "power of control," which as the jury was instructed, "is the power over the process, not just the outcome" of the work. J.A. 94.

Cardinal argues that the court effectively provided the jury two theories of liability, only one of which was correct. Relying on our decision in *Harwood v. Partredereit AF 15.5.81*, 944 F.2d 1187 (4th Cir. 1991), Cardinal insists that the error was prejudicial. We disagree.

In *Harwood*, the plaintiff brought suit to redress injuries he suffered when attempting to board the defendant's ship. *Id.* at 1189. Following trial, the court instructed the jury that it could impose liability on the defendant if it found either (1) that the plaintiff's injuries were caused by defendant's negligence, or (2) that the plaintiff's injuries were caused by the ship's "unseaworthy" condition. *Id.* Regarding the latter theory, the court instructed that the defendant could be found liable even without fault, because the plaintiff was owed a "warranty of seaworthiness." *Id.* The court told the jury, "The claim

13

of negligence and the claim of unseaworthiness . . . are separate claims, and you must consider them separately." *Id.* After the jury returned a general verdict for the plaintiff, the defendant appealed. *Id.* at 1192.

On appeal, we held that the plaintiff was not, in fact, owed a warranty of seaworthiness. *Id.* at 1190–92. Thus, the defendant was liable for the plaintiff's injuries only if he was found negligent. *Id.* at 1192. Then, after "closely examin[ing] the possible impact" of the erroneous seaworthiness instruction, *id.*, we concluded that there was a "significant risk" that the jury relied upon it to reach its verdict, *id.* at 1193. Thus, we held that provision of the seaworthiness instruction constituted prejudicial error, and we remanded the case for a new trial. *Id.* at 1193.

Here, there's no "significant risk" that the jury relied on the rebuttable presumption instruction to render its verdict. As the jury was instructed, West Virginia common law requires satisfaction of four elements to establish an employment relationship in the vicarious liability context. *See Cunningham*, 737 S.E.2d at 277. Of those four elements, Cardinal contested only the "power of control." Extensive evidence in the record, independent of the rebuttable presumption, supports Edwards's *prima facie* case that this element was satisfied.

For instance, the evidence shows that Cardinal prevented McGowan (in his capacity as a sales agent) from working with any other carrier for the duration of their agreement and required that McGowan refrain from competing with Cardinal for a year following the agreement's termination. Cardinal also required that McGowan receive advance authorization prior to securing any new customers. In addition, Cardinal bound McGowan

14

to its Policy Manual—a voluminous document in which Cardinal retained final review over all shipping rates McGowan negotiated. And finally, Cardinal prohibited McGowan from signing off on any contracts without its approval.

Once McGowan secured a client, McGowan's drivers fulfilled shipments for Cardinal. In this capacity, too, McGowan's business was entirely with Cardinal. When delivering shipments, McGowan's drivers were required to provide daily updates to Cardinal on their progress. Indeed, a Cardinal dispatcher testified that it would be typical for her to call McGowan on a *daily basis* for updates on his drivers. Additionally, Cardinal controlled substantial aspects of the client relationship by handling customer billing and invoices.

In sum, this record presents little risk—let alone a "significant" one—that the jury relied on an erroneous instruction in rendering its verdict.[5] *See Harwood*, 944 F.2d at 1193. It bears reiterating here that our review is limited to the question of whether Edwards made a *prima facie* case, absent the rebuttable presumption, that McGowan was Cardinal's employee. That's because under state common law, a *prima facie* case shifted the burden to Cardinal to disprove the employment relationship. *See Zirkle*, 585 S.E.2d at 24.

---

[5] In addition to the lease term, Cardinal argues that certain *conduct* mandated by the regulations can't be considered for the vicarious liability analysis. For instance, federal regulations provide that motor carriers must place their logo on lessor trucks, set minimum qualification standards for lessor drivers, and require that the motor carrier's name be listed on delivery receipts. *See* 49 C.F.R. §§ 373.101, 390.21, 391.11. According to Cardinal, such conduct is indicative only of the government's control over Cardinal and not of Cardinal's control over McGowan. But because Edwards established a *prima facie* case without consideration of that conduct, we decline to reach that argument.

15

At bottom, the complained-of instruction didn't affect the jury's ultimate liability determination, which was in all cases determined by state common law.  In contrast, the jury in *Harwood* was instructed on two separate theories of liability, either of which could form the sole basis of the jury's verdict.  But here, the jury was merely instructed on two ways in which the burden could shift to Cardinal to disprove the employment relationship.

And regardless of *how* this burden was shifted, the jury clearly found that Cardinal failed to carry it.  As the jury was instructed, Cardinal couldn't be held liable for McGowan's actions if it proved by a "greater weight of the evidence" that McGowan was an independent contractor.  J.A. 95.  Indeed, the court further instructed that Cardinal could prevail in this showing even if it "retain[ed] broad general power of supervision and control as to the results of the work," including the "right to inspect, to stop the work, [or] to make suggestions or recommendations as to the details."  *Id.*  Cardinal could retain this level of control, the court explained, "without changing the relationship from that of owner and independent contractor."  *Id.*

Nonetheless, the jury returned a verdict that found Cardinal liable for McGowan's negligence, necessarily finding that Cardinal failed to show that McGowan was an independent contractor.  As to this issue, we consider not whether the jury was correct in that finding, but only whether Cardinal was correctly put to the task.  We find that it was, and thus conclude that any error in the jury instructions was harmless.

B.

Next, we address Cardinal's claim that the jury verdict was against the weight of the evidence, which in Cardinal's view showed that McGowan was acting outside the scope of

16

his employment when Edwards was injured. Specifically, Cardinal argues that the act of consolidating multiple shipments onto a truck was beyond the scope of McGowan's alleged employment with Cardinal. Because Edwards was injured while helping McGowan complete that consolidation process, Cardinal argues that it can't be held vicariously liable for his injuries.

Although Cardinal sought a new trial in the district court on the basis that the verdict was against the weight of the evidence (which the court denied), it didn't separately move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. Given that omission, we will not disturb the jury's verdict if there is "any evidence" to support it. *Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 187 (4th Cir. 1994) (cleaned up). This practice stems from our view that "implicit in the party's failure to move for judgment as a matter of law is the belief that the evidence created a jury issue," and the litigant "should not be permitted on appeal to impute error to the trial judge for sharing that view." *Id.* (cleaned up).

An act is considered within the scope of one's employment if it is "specifically or impliedly directed" by the employer or is "an ordinary and natural incident or result of" such an act. *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751, 768–69 (W. Va. 2014) (cleaned up). Even if the employee's act is unauthorized, it's within the scope of his employment if taken "within his general authority and for the benefit of the employer." *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 431 (W. Va. 1998). The act must be "at least in part" for the employer's benefit, but that need not be the sole motive. *W. Va. Reg'l Jail*, 766 S.E.2d at 769 (cleaned up). We find that to be the case here.

17

For starters, the record shows that Cardinal impliedly authorized consolidation. McGowan testified that "load consolation is normal," J.A. 273, that he had been consolidating loads for Cardinal for between 12 and 14 years, and that Cardinal was likely aware of the practice. Additionally, a long-time Cardinal dispatcher spoke knowledgeably about consolidation, specifically noting that McGowan regularly consolidated partial loads.

Moreover, McGowan consolidated loads (at least in part) to benefit Cardinal's drivers and its clients. Doing so benefitted drivers because it maximized the number of shipments (and pay) they could make per truck. One could infer that Cardinal benefitted from those savings because it could hire fewer drivers and, in the words of Cardinal's owner, fulfill its "responsibility to try to make the owner-operator as much money as possible." J.A. 459. This practice also benefitted Cardinal's clients by allowing them to get the freight weighed, priced, and "off their property" by certain deadlines. J.A. 271. In fact, this precise situation was facing Cardinal's client, Special Metals, when Edwards was injured helping consolidate its shipment.

In sum, we are satisfied that the jury's verdict is supported by evidence in the record. Accordingly, we affirm the district court's denial of Cardinal's request for a new trial.

## III.

For the reasons given, we affirm the district court's judgment.

*AFFIRMED*

18

AGEE, Circuit Judge, dissenting:

I respectfully dissent from the majority's conclusion that any error in the district court's jury instruction was harmless. The court instructed the jury that Richard Edwards, Jr. was required to establish an employer/employee relationship between Cardinal Transport, Inc. and Danny McGowan and could do so by either of two theories of McGowan's employee status, one of which was erroneous as a matter of law. The jury then rendered a general verdict against Cardinal that did not specify upon which theory it relied. Because it is not "reasonably certain that the jury's verdict was not influenced by the erroneously-submitted . . . theory," I would vacate the judgment of the district court and remand this case for a new trial. *Harwood v. Partredereit AF 15.5.81*, 944 F.2d 1187, 1193 (4th Cir. 1991) (internal quotation marks and alteration omitted).

I.

"We review de novo whether the district court's instructions to the jury were correct statements of law." *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 538 (4th Cir. 2000). The jury instruction at issue provided that Edwards could carry his initial burden of establishing a prima facie case as to McGowan's employment status in one of two ways: (1) through a rebuttable presumption that McGowan was Cardinal's employee or (2) proving the state common law elements of an employer/employee relationship. The majority has declined to decide whether the rebuttable presumption instruction was a correct statement of law. Instead, it has relied on its harmless error analysis to conclude the instruction could not have seriously prejudiced Cardinal's case. But because that

19

instruction was erroneous as a matter of law, and because the general jury verdict did not make it reasonably certain that the jury was not influenced by the erroneous instruction, I conclude the resulting verdict was rendered invalid.

In contrast to the burden imposed on Edwards under West Virginia common law, the rebuttable presumption instruction gave Edwards a much easier route to establishing a prima facie case that Cardinal was McGowan's employer. Under that instruction, Edwards only had to establish that Cardinal leased the equipment to McGowan at the time of the accident and that the leased equipment was in operation under Cardinal's carrier authority. And here, those facts were not contested such that Edwards was automatically able to establish a prima facie case that Cardinal was McGowan's employer. The presumption then shifted the burden of proof to Cardinal, requiring it to disprove that employment relationship.

By contrast, under the alternative theory of a West Virginia common law employment relationship, Edwards could establish a prima facie employer/employee relationship only by proving that:

1. Cardinal . . . selected and engaged McGowan/McElliotts;
2. Cardinal . . . paid compensation to McGowan/McElliotts;
3. Cardinal . . . held a power of dismissal over McGowan/McElliotts; and
4. Cardinal . . . held a power of control over McGowan/McElliotts.

J.A. 94. But nothing in the record establishes that the jury found Edwards proved the facts supporting the common law elements. Furthermore, even assuming he presented such facts to the jury, it could have discredited that evidence but found an employment relationship by relying solely on the rebuttable presumption. Thus, once the rebuttable presumption was

20

established, the burden shifted to Cardinal to *disprove* an employment relationship that Edwards *never in fact* established.

As the majority explained, the district court determined to adopt the rebuttable presumption approach based on its construction of 49 C.F.R. § 376.12(c)(1) and (4). Subsection (c)(1) gives motor carriers "exclusive possession, control, and use of the equipment for the duration of the lease" and requires them to "assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1). In the district court's view, this grant of control under (c)(1) "support[ed] a prima facie case that the motor carrier employs . . . the owner-operator," Maj. Op. at 11, and gave rise to a rebuttable presumption that the owner-operator was an employee of the motor carrier.

But the district court erred in concluding that the rebuttable presumption was appropriate under (c)(1) because it ignored the plain language of (c)(4), which clearly provides that "[n]othing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee." 49 C.F.R. § 376.12(c)(4). Notwithstanding (c)(4)'s prohibition against (c)(1)'s effect in determining an employment relationship, the district court nonetheless inferred a rebuttable presumption of employment from (c)(1) and opined that this approach accounted for (c)(4) "by allowing the motor carrier to rebut that prima facie case, thereby leaving the ultimate determination a matter of state common law." Maj. Op. at 11–12; *Edwards v. McElliotts Trucking, LLC*, 268 F. Supp. 3d 867, 879 (S.D.W. Va. 2017) ("The ultimate classification of the

21

relationship is still determined by resort to West Virginia common law when a carrier invokes the independent contractor defense.").

The error in the district court's construction of (c)(1) and (c)(4) is underscored by the Interstate Commerce Commission's explicit warnings and disclaimers not to use (c)(1) in establishing employee status, but to rely solely on state law. Prior to implementing (c)(4), the Commission stated:

> We prefer that courts decide suits of this nature by applying the ordinary principles of State tort, contract, and agency law. The Commission did not intend that its leasing regulations would supersede otherwise applicable principles of State tort, contract, and agency law and create carrier liability where none would otherwise exist. *Our regulations should have no bearing on this subject. Application of State law will produce appropriate results.*

Lease and Interchange of Vehicles (Identification Devices) (49 C.F.R. Part 1057), 3 I.C.C.2d 92, 93 (1986) (emphasis added). The Commission further clarified that the "regulations are silent on the agency status of lessors, and [it] has taken no position on the issue of independence of lessors." Petition to Amend Lease & Interchange of Vehicle Regulations, 8 I.C.C.2d 669, 671 (1992). Thus, "*the type of control required by [§ 376.12(c)(1)] does not affect 'employment' status*[.]" *Id.* (emphasis added).

The Commission ultimately codified its position in (c)(4) because, even after it announced its position and issued notices, some courts continued to erroneously "rel[y] on [§ 376.12(c)(1)] and [hold] the language to be *prima facie evidence of an employer-employee relationship*." *Id.* (emphasis added). This type of error compelled the Commission to promulgate (c)(4) so that it could clarify once more "that [(c)(1)] does not affect 'employment' status[.]" *Id.*

22

The district court's interpretation of (c)(1) is exactly the error that the Commission sought to prevent through its adoption of (c)(4). In ignoring the Commission's plain statement of regulatory purpose, the district court here incorrectly instructed the jury that it could find a rebuttable presumption of an employment relationship based on (c)(1). That instruction was a clearly erroneous interpretation that directly contradicted the Commission's regulatory enactments.

The district court's interpretation also conflicts with the decisions of our sister circuits. Two courts of appeals have, citing the Commission's clear position, rejected any interpretation of the language in (c)(1) as prima facie evidence of an employment relationship. *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010); *Simpson v. Empire Truck Lines, Inc.*, 571 F.3d 475, 477 (5th Cir. 2009). In *Huggins*, a plaintiff injured by a FedEx vehicle driver's negligent operation of the vehicle sued FedEx, arguing in part that the company was vicariously liable for the injury under § 376.12(c)(1). The Eighth Circuit rejected this claim, holding "liability under § 376.12(c)(1) . . . is not bottomed on any alleged 'employee/agent/servant' relationship between a carrier and the vehicle's driver." 592 F.3d at 862. Instead, relying on the Commission's comments, the court held that (c)(1) has "no effect on the legal relationship between a carrier and the driver of its leased vehicle[.]" *Id.* Consistent with this holding, the Eighth Circuit has solely applied state law to the question of whether a person is an independent contractor or employee in determining an issue of liability. *See id.* at 857 ("Because [the plaintiff] based his negligence claim against [a motor carrier] on the doctrine of respondeat superior, he had to establish that the driver . . . was [the carrier's] employee. Under Missouri law, the

23

resolution of this issue depends upon the particular facts of each case and is usually a question for the jury. . . ."); *Great W. Cas. Co. v. Nat'l Cas. Co.*, 807 F.3d 952, 659 (8th Cir. 2015) (holding that in determining the scope of a contract's liability coverage, courts must determine whether a person is an independent contract or employee based on state law alone).

Likewise, the Fifth Circuit examined § 376.12(c)(1) and held that it did not affect or confer any employee status. *Simpson*, 571 F.3d at 477. These decisions, along with the Commission's regulations and notices,[1] make clear that the district court's reliance on (c)(1) to create a rebuttable presumption was error and, in turn, rendered the rebuttable presumption instruction erroneous as a matter of law.

## II.

We now consider the manner in which the erroneous instruction affected the verdict. The jury here was "instructed on two theories of liability, one which [was] proper and the other which [was] not[.]" *Harwood*, 944 F.2d at 1192–93. The majority posits that given the procedural posture of this case, any error in the jury instruction was harmless because "the jury was merely instructed on two ways in which the burden could shift to Cardinal to disprove the employment relationship." Maj. Op. at 16. This view overlooks that the

---

[1] As noted, the Commission stated that courts should not interpret the language of the control regulation "to be prima facie evidence of an employer-employee relationship," Petition to Amend Lease & Interchange of Vehicle Regulations, 8 I.C.C.2d at 671, and instead must rely solely on "applicable principles of State . . . agency law" to determine an agency relationship, Lease and Interchange of Vehicles (Identification Devices) (49 C.F.R. Part 1057), 3 I.C.C.2d at 93.

24

erroneous jury instruction concerned a required predicate element of liability. Once the jury found Edwards established a prima facie case that McGowan was Cardinal's employee based on either of the two theories—including one that was incorrect—Cardinal's burden to carry its defense was triggered.

As explained earlier, however, if the jury followed the rebuttable presumption instruction and discredited Edwards's proof of the common law employment relationship, then Cardinal was required to disprove the elements of employment status under West Virginia law that *Edwards never proved*. In other words, Cardinal had to rebut facts never put into evidence and found by a jury. And we have no way to ascertain which path the jury chose based on its general verdict.

Conversely, had the jury not been instructed on the rebuttable presumption and found Edwards had failed to make a prima facie case that McGowan was Cardinal's employee under West Virginia common law, the jury would have been required to render a verdict for Cardinal without ever reaching the independent contractor defense.

"When a jury is instructed on two theories of liability, one which is proper and the other which is not, the court must remand the case for a new trial unless it is reasonably certain that the jury's verdict was not influenced by the erroneously-submitted . . . theory." *Harwood*, 944 F.2d at 1192–93 (internal quotation marks and alteration omitted). Here, the jury rendered a general verdict, and we "cannot determine on which theory the jury reached its decision." *Id.* at 1193. The general verdict thus did not eliminate "a significant risk that the jury, having been improperly instructed on the [rebuttable presumption theory], relied upon this erroneous instruction in arriving at its verdict." *Id.*

25

In turn, an appellate court cannot reach a harmless error conclusion by crediting evidence as proven fact when the record does not show that the jury found that evidence to establish the necessary facts. *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 575–76 (4th Cir. 1995) ("It is a basic tenet of our legal system that, although appellate courts often review facts found by a judge or jury to ensure that they are not clearly erroneous, they do not make such findings in the first instance."). Because the verdict did not make it "reasonably certain" that the jury was not influenced by the erroneous rebuttable presumption theory, I would vacate the verdict for Edwards and remand for a new trial.